UNITED STATES of America, Plaintiff–Appellant, Cross–Appellee,

v.

Alan MIKELL; Christopher Grisel, Defendants–Appellees, Cross–Appellants.

Nos. 01–2534, 01–2535, 01–2536, 01–2537.

United States Court of Appeals, Sixth Circuit.

Dec. 1, 2003.

486

David J. Debold, Asst. U.S. Attorney, U.S. Attorney's Office, Detroit, MI, for Plaintiff-Appellant/Cross-Appellee.

Harold Z. Gurewitz, Gurewitz & Raben, Detroit, MI, for Defendant-Appellee/Cross-Appellant.

Before KEITH, COLE and COOK, Circuit Judges.

## OPINION

COOK, Circuit Judge.

Plaintiff–Appellant, the United States of America, appeals the district court's grant of defendants' motions to acquit after a jury verdict finding them guilty of conspiracy to launder money and wire fraud. The district court granted the defendants' post-trial motions for acquittal for improper venue on several counts and for insufficient evidence on the remaining counts. The United States appeals only the judgment of acquittal for insufficient evidence. Alan Mikell and Christopher Grisel cross-appeal the district court's ruling that their motions for mistrial were rendered moot by the judgment of acquittal. We **RE-VERSE** the district court's judgment of acquittal on those counts appealed, reinstate the jury's verdicts, and remand to the district court for consideration of defendants' mistrial motions.

## I. BACKGROUND

The offending conduct at stake in this appeal concerns Mikell and Grisel's self-dealing (using mail, fax and telephone) that defrauded secured creditor NFO by diverting most of the value of certain inventory from NFO during the closing days of defendants' cheese-manufacturing business. The series of separate corporations controlled by Mikell and Grisel and the debtor-creditor relationships among these entities and their creditors dictates the outcome of this appeal.

Kraft Company owned a cheese-making plant in Pinconning, Michigan. In 1993, a corporation controlled by Arthur Dore, Pinconning Cheese Co, purchased the plant and equipment from Kraft Company and operated it as Dore's Pinconning Cheese, Inc. (DPC). DPC borrowed $1.5 million from another Dore-controlled entity, Dore & Associates. Dore and Associates secured repayment of this debt by taking a security interest in DPC's assets, including its cheese inventory.

Mikell and Grisel's involvement with the cheese plant began in 1994 as creditors. DPC borrowed $1 million from EarthSafe, a new corporation formed by corporations owned by Mikell and Grisel. EarthSafe too took a security interest in DPC's cheese inventory and other assets to secure its loan. Later that year, EarthSafe purchased DPC from Dore, including the $1.5 million secured debt owed by DPC to Dore and Associates. EarthSafe began operating the cheese plant as Paul's Pinconning Cheese (PPC).

In March, 1995, the Michigan Department of Agriculture suspended PPC's license and shut down the plant because PPC owed its major milk supplier about $1,000,000. That supplier—National Farmer's Organization (NFO)—was a

trust that operated on behalf of its collective member-farmers to market their milk and to collect and disburse money owed to them. In order to resume production, EarthSafe itself obtained a license and then reopened the plant under the EarthSafe name, leasing its equipment and facilities from PPC.

A few months later, Mikell and EarthSafe formed Real Pinconning Cheese, L.C. (RPC) as a new limited liability corporation under Michigan law. RPC began operating the plant in June 1995. It leased the facility and equipment from PPC, obtained its own dairy license, purchased milk, and produced and sold cheese.

Following the earlier financial problems that caused the plant shut down, NFO sold to any business operating that plant on a cash basis only. RPC, however, proposed a credit payment method that induced NFO to extend credit. RPC arranged for Concord Growth Corporation (Concord) to function as a factor, depositing all RPC's accounts receivable in an account controlled exclusively by Concord and inaccessible to RPC. The factoring arrangement allowed Concord to control this account with the understanding that RPC would receive payment only after NFO's invoices were paid. Several agreements implemented this payment arrangement. First, RPC and Concord signed a factoring agreement that secured payment of the factor fees with a security interest in RPC's assets and inventory. Second, RPC and NFO executed a collateral pledge and security agreement by which RPC gave NFO a first lien and security interest in RPC's cheese inventory. Last, Concord agreed with NFO to subordinate a substantial amount of its (Concord's) interest in the cheese inventory to NFO's interest. In October 1995, the parties filed a UCC–1 statement identifying NFO's lien on RPC's cheese inventory.

Despite the factoring of RPC's receivables, by January 1996 RPC owed NFO over $1 million. This debt was not the same debt that *PPC* owed to NFO. NFO notified RPC that it was holding RPC in default and exercising control over the collateral—approximately 770,000 pounds of cheese. A number of events took place at this time. Unknown to NFO, Mikell and Grisel contracted to sell the cheese inventory to Nor–Tech Dairy Advisors for $0.25 per pound, well below the market price of about $1.40 per pound. This agreement required Nor–Tech to immediately resell the cheese to InnoQuest, an entity owned by Grisel, for $0.30 per pound, allowing Nor–Tech to make $0.05 per pound on the transaction and allowing Grisel, through InnoQuest, to acquire the cheese inventory at a price well below market value for eventual resale at market prices.

Without knowing about the secret resale scheme being orchestrated by the defendants, NFO obtained a state court order enjoining the removal of the cheese inventory from RPC's plant to enforce its security interest in the inventory. Faced with this barrier to their scheme, Mikell and Grisel represented to NFO that the cheese inventory was to be sold at market price and the sales proceeds would be paid directly to Concord and in turn, to NFO. This persuaded NFO to lift the injunction.

Defendants withheld the details of its below market sales to Nor–Tech and resale to InnoQuest. The proceeds of the eventual resale of the cheese at market prices enabled the defendants to divert over $1.00 per pound, more than $700,000, from NFO. Most of that amount was paid to a special InnoQuest account under Grisel's control and was used to benefit Mikell and Grisel. Despite the agreement that all RPC accounts receivable go to Concord, the only money paid to the Concord account was the proceeds of the initial sale to

Nor–Tech for $0.25 per pound; not the $1.36 and $1.40 per pound that InnoQuest received from two ultimate buyers. As part of the plan to cover up these resales, Grisel directed the two buyers to whom InnoQuest resold cheese to make the majority of their payments to Nor–Tech. It in turn forwarded the money to InnoQuest. InnoQuest (controlled by Grisel) disbursed the money to, among others, Mikell.

The United States charged Mikell and Grisel with conspiracy, mail fraud, and wire fraud, among other crimes, in a fifty-two-count indictment. The jury found them guilty on a number of counts. But after verdict, the district court granted Defendants' motions for acquittal under Rule 29 of the Federal Rules of Criminal Procedure. The court decided that the United States failed to prove that the object of the scheme was money or property with value and, without having proved the underlying offenses, the conspiracy counts could not stand either and failure to prove venue prompted dismissal of all the other counts. The United States appealed only the counts dismissed for insufficiency of the evidence. Defendants cross-appealed, arguing that the district court erred by failing to rule on their remaining post-trial motions—motions the district court determined to be moot in light of its grant of the motions for acquittal.

## II.  ANALYSIS

### A.  Standard of review

Rule 29(c) of the Federal Rules of Criminal Procedure allows the district court to set aside a jury verdict and enter judgment of acquittal when, "after viewing the evidence in the light most favorable to the United States," the trial court finds that no rational trier of fact "could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61

L.Ed.2d 560 (1979). In reviewing a district court's order of acquittal, we apply the same standard to the record before us, assuming the truth of the evidence offered by the government. *United States v. Connery,* 867 F.2d 929, 930 (6th Cir.1989). The granting of a motion for acquittal should be confined to those cases where the government's failure is clear. *Id.*

### B.  Elements of the offenses

In order to convict defendants, the United States needed to prove that Mikell and Grisel, having devised a scheme to defraud for obtaining money or property by means of false or fraudulent pretenses, transmitted by wire, radio, or television, in interstate commerce, any writings or sounds for the purpose of executing the scheme. 18 U.S.C. § 1343. And for the conspiracy count, the United States needed to prove that defendants *conspired* to commit criminal offenses of the type set forth in the indictment. 18 U.S.C. § 1956(h). The only issue on appeal is whether the United States proved beyond a reasonable doubt that the object of the scheme was money or property.

### C.  Sufficient evidence

Considering the evidence in the light most favorable to the United States, we find that a rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. *Jackson,* 443 U.S. at 319. The district court erred by granting the motions for acquittal.

In reaching its decision to acquit, the district court took the view that all of the defendants' entities' debts encumbered the RPC inventory. That view reflects the court's mistaken analysis that, because the government premised its theory of criminal responsibility on Mikell and Grisel's consistent dominance of the various corpo-

rate entities as one continuous enterprise, the entities likewise merged for purposes of analyzing NFO's commercial interests in the inventory. Proceeding from that premise, the trial court viewed the inventory as valueless to NFO because, as it reasoned, Mikell and Grisel's cheese business owed Dore & Associates and Earth-Safe millions of dollars in prior liens—more than the value of the inventory. Thus, the court concluded, NFO would have realized no value from the inventory and therefore it was deprived of nothing. Because obtaining money or property must be the object of a scheme to defraud under 18 U.S.C. § 1343, the court found that proving the scheme to defraud NFO did not suffice to prove the "money or property" element of a § 1343 offense.

But neither Dore and Associates nor EarthSafe had a security interest in the cheese inventory of *RPC*. Dore took a security interest in Pinconning Cheese, Inc. and EarthSafe in PPC. Mikell and Grisel structured the various entities so that only NFO's Collateral Pledge and Security Agreement encumbered RPC's inventory (Concord's interest in the inventory was subordinated to NFO's interest); the agreement specified NFO's as the first lien.

Moreover, RPC was a new, separate corporation leasing the plant and equipment from PPC but with no obligation to PPC's creditors, including EarthSafe. RPC did not even exist when Dore and EarthSafe obtained their security interests in the inventory of corporations that owned the cheese plant earlier, PPC and DPC. The district court itself confirmed in its jury instructions that "Dore has a security interest in Pinconning Cheese, Inc., and Earthsafe has a security interest in Dore's Pinconning Cheese, Inc."

Unquestionably, *defendants* recognized NFO's commercial right to the cheese in-

ventory as superior *to Dore and EarthSafe* because RPC paid NFO (through Concord) the entire proceeds of initial, duplicitous, below-market sale. Both Mikell and Grisel testified that *NFO* controlled the inventory after default. (Mikell–JA at 1609–10; Grisel–JA at 1647–48). Had RPC sold the inventory at market prices, NFO would have realized some $700,000 more through the Concord factoring arrangement. Instead, defendants' contrived chain of resales diverted the majority of the sale proceeds to Defendants' benefit. A reasonable trier of fact could have found the essential "money or property" element on this aspect of the evidence alone.

Viewing the evidence in the light most favorable to the government, we find that a rational trier of fact could have found that defendants suffered a loss that suffices to prove the "money or property with value" element of the offense. *United States v. Dandy*, 998 F.2d 1344, 1358 (6th Cir.1993). The district court erred therefore in granting the motions for acquittal on those counts appealed.

### D. Pending motions

Having determined that the district court erred by granting the motions for acquittal, we also agree with the defendants' argument and the United States' concession that the cause should be remanded. When the district court vacated the convictions, it ruled that the judgment dismissing the case rendered the pending motions for mistrial moot. Federal Rule of Criminal Procedure 29(d)(1) requires district courts entering a judgment of acquittal after a guilty verdict to decide whether a motion for a new trial should be granted if the judgment of acquittal is later reversed. Defendants' two unconsidered motions ask the district court to order a new trial due to irregularities in the

**490**

trial proceedings. The court erred in failing to rule on these two motions.

### III.  CONCLUSION

The district court erred in granting the motions for acquittal. We **REVERSE** the district court's judgment of acquittal, reinstate the convictions on the counts appealed and remand the case to the district court to consider the motions for mistrial that were pending at the time of the judgment of acquittal.