NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0613n.06

**Nos. 07-1488 and 07-1524**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

**Aug 27, 2009**

LEONARD GREEN, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT COURT |
| | ) | FOR THE EASTERN DISTRICT |
| v. | ) | OF MICHIGAN |
| | ) | |
| | ) | |
| ALAN MIKELL and | ) | O P I N I O N |
| CHRISTOPHER GRISEL, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

Before:  GILMAN and McKEAGUE, Circuit Judges, and SARGUS, District Judge.[*]

**SARGUS, District Judge.**  The Appellants, Alan Mikell and Christopher Grisel, appeal

their convictions on charges of conspiracy to commit money laundering (18 U.S.C. § 1956) and wire

fraud (18 U.S.C. § 1343).  Following a three month jury trial, the district court granted both

defendants' post-conviction motions for acquittal, concluding that the venue was improper as to

certain counts not at issue in this appeal and, as to counts at issue here, that the evidence was

insufficient to support the convictions.[1] *United States v. Mikell*, 163 F. Supp. 2d 720, 743 (E.D.

Mich. 2001).

---

[*]The Honorable Edmund A. Sargus, Jr., United States District Judge for the Southern District of
Ohio, sitting by designation.

[1]The district court held that the government had failed to prove venue as to Counts 15 through
20, 27 and 29.  The government did not appeal the district court's dismissal of these counts.
Consequently, these counts are not at issue in this appeal.

The government appealed the district court's order granting the defendants' motions to acquit. This Court reversed the judgment of acquittal, finding that a rational jury could have found both defendants guilty of conspiracy to commit money laundering and mail fraud. *United States v. Mikell,* Nos. 01-2534, 01-2535, 01-2536, and 01-2537, 84 Fed. Appx. 485 (6th Cir. Dec. 1, 2003).

The case was remanded and the district court was directed to rule upon the defendants' motions for a new trial based upon alleged "irregularities in the trial proceeding." *Mikell,* 84 Fed. Appx. at 488–90. On remand, the district court overruled the defendants' motion for a new trial. This appeal followed. For the reasons that follow, the judgment of the district court is affirmed.

## I.

In the first appeal, this Court described the evidence presented to the jury as follows:

The offending conduct at stake in this appeal concerns Mikell and Grisel's self-dealing (using mail, fax and telephone) that defrauded secured creditor NFO by diverting most of the value of certain inventory from NFO during the closing days of defendants' cheese-manufacturing business. The series of separate corporations controlled by Mikell and Grisel and the debtor-creditor relationships among these entities and their creditors dictates the outcome of this appeal.

Kraft Company owned a cheese-making plant in Pinconning, Michigan. In 1993, a corporation controlled by Arthur Dore, Pinconning Cheese Co., purchased the plant and equipment from Kraft Company and operated it as Dore's Pinconning Cheese, Inc. (DPC). DPC borrowed $1.5 million from another Dore-controlled entity, Dore & Associates. Dore and Associates secured repayment of this debt by taking a security interest in DPC's assets, including its cheese inventory.

Mikell and Grisel's involvement with the cheese plant began in 1994 as creditors. DPC borrowed $1 million from EarthSafe, a new corporation formed by corporations owned by Mikell and Grisel. EarthSafe too took a security interest in DPC's cheese inventory and other assets to secure its loan. Later that year, EarthSafe purchased DPC from Dore, including the $1.5 million secured debt owed by DPC to Dore and Associates. EarthSafe began operating the cheese plant as Paul's Pinconning Cheese (PPC).

2

In March, 1995, the Michigan Department of Agriculture suspended PPC's license and shut down the plant because PPC owed its major milk supplier about $1,000,000. That supplier--National Farmer's Organization (NFO)--was a trust that operated on behalf of its collective member-farmers to market their milk and to collect and disburse money owed to them. In order to resume production, EarthSafe itself obtained a license and then reopened the plant under the EarthSafe name, leasing its equipment and facilities from PPC.

A few months later, Mikell and EarthSafe formed Real Pinconning Cheese, L.C. (RPC) as a new limited liability corporation under Michigan law. RPC began operating the plant in June 1995. It leased the facility and equipment from PPC, obtained its own dairy license, purchased milk, and produced and sold cheese.

Following the earlier financial problems that caused the plant shut down, NFO sold to any business operating that plant on a cash basis only. RPC, however, proposed a credit payment method that induced NFO to extend credit. RPC arranged for Concord Growth Corporation (Concord) to function as a factor, depositing all RPC's accounts receivable in an account controlled exclusively by Concord and inaccessible to RPC. The factoring arrangement allowed Concord to control this account with the understanding that RPC would receive payment only after NFO's invoices were paid. Several agreements implemented this payment arrangement. First, RPC and Concord signed a factoring agreement that secured payment of the factor fees with a security interest in RPC's assets and inventory. Second, RPC and NFO executed a collateral pledge and security agreement by which RPC gave NFO a first lien and security interest in RPC's cheese inventory. Last, Concord agreed with NFO to subordinate a substantial amount of its (Concord's) interest in the cheese inventory to NFO's interest. In October 1995, the parties filed a UCC-1 statement identifying NFO's lien on RPC's cheese inventory.

Despite the factoring of RPC's receivables, by January 1996 RPC owed NFO over $1 million. This debt was not the same debt that PPC owed to NFO. NFO notified RPC that it was holding RPC in default and exercising control over the collateral-- approximately 770,000 pounds of cheese. A number of events took place at this time. Unknown to NFO, Mikell and Grisel contracted to sell the cheese inventory to Nor-Tech Dairy Advisors for $0.25 per pound, well below the market price of about $1.40 per pound. This agreement required Nor-Tech to immediately resell the cheese to InnoQuest, an entity owned by Grisel, for $0.30 per pound, allowing Nor-Tech to make $0.05 per pound on the transaction and allowing Grisel, through InnoQuest, to acquire the cheese inventory at a price well below market value for eventual resale at market prices.

Without knowing about the secret resale scheme being orchestrated by the defendants, NFO obtained a state court order enjoining the removal of the cheese

3

inventory from RPC's plant to enforce its security interest in the inventory. Faced with this barrier to their scheme, Mikell and Grisel represented to NFO that the cheese inventory was to be sold at market price and the sales proceeds would be paid directly to Concord and in turn, to NFO. This persuaded NFO to lift the injunction.

Defendants withheld the details of its below market sales to Nor-Tech and resale to InnoQuest. The proceeds of the eventual resale of the cheese at market prices enabled the defendants to divert over $1.00 per pound, more than $700,000, from NFO. Most of that amount was paid to a special InnoQuest account under Grisel's control and was used to benefit Mikell and Grisel. Despite the agreement that all RPC accounts receivable go to Concord, the only money paid to the Concord account was the proceeds of the initial sale to Nor-Tech for $0.25 per pound; not the $1.36 and $1.40 per pound that InnoQuest received from two ultimate buyers. As part of the plan to cover up these resales, Grisel directed the two buyers to whom InnoQuest resold cheese to make the majority of their payments to Nor-Tech. It in turn forwarded the money to InnoQuest. InnoQuest (controlled by Grisel) disbursed the money to, among others, Mikell.

*Mikell*, 84 Fed. Appx. at 486–88.

After the jury found the defendants guilty on a number of counts, the district court granted the defendants' motions for acquittal under Rule 29, concluding that the government had failed to prove the necessary elements. The government appealed only the counts dismissed for insufficiency of the evidence. Defendants cross-appealed, asserting that the district court erred by failing to rule on their remaining post-trial motions, which the district court had determined to be moot in light of its grant of the motions for acquittal. *Mikell*, 84 Fed. Appx. at 488.

On appeal, this Court concluded that a rational jury could have found that the defendants committed both money laundering and wire fraud. *Mikell*, 84 Fed. Appx. at 488. The Court also found that the evidence supported the government's theory that the defendants had sold a large quantity of cheese, which was subject to the NFO's first position security interest, to a third party at a price far below the market. *Id.*, 84 Fed. Appx. at 488–89. The defendants misrepresented to NFO that the cheese would be sold at the market price. Thereafter, as the government contended,

4

the third party acted in conspiracy with the defendants to resell the same cheese back to business entities controlled by the defendants, who then reaped approximately $700,000 that was due NFO as the secured party. *Id.*, 84 Fed. Appx. at 488–89.

On remand, the district court denied the defendants' motion for a new trial by order issued November 18, 2004. (Order, May 16, 2006/JA 259.) On December 3, 2004, Mikell filed a motion, which Grisel later joined, for reconsideration of the denial. (*Id.*) On February 22, 2005, Grisel filed a motion for a new trial or acquittal based upon newly discovered evidence, requesting an evidentiary hearing. (*Id.*)

On July 12, 2005, the district court issued an order denying Grisel's motion for a new trial based on newly discovered evidence of alleged perjury and granting, in part, Mikell's motion for reconsideration. (Order July 12, 2005.) After conducting an evidentiary hearing on August 17 and 18, 2005, the court declined to vacate or modify its November 18, 2004 order denying the defendants a new trial. (Order, May 16, 2006.)

**(i)      Grisel's Motion.**

Grisel's claim of newly discovered evidence involved the trial testimony of attorneys Joseph Purtell and Richard Green, who were alleged to have given perjured testimony at trial. Both attorneys represented NFO in a parallel civil proceeding involving the defendants. Purtell testified that, while attending a deposition in the civil proceeding, Attorney Dennis Opperman, an attorney then representing the defendants, told Purtell that "[attorney] Steve Harris calls all the shots." (JA 2413–14.) The government contended, as described in more detail below, that Harris was essentially an unindicted co-conspirator. On cross-examination during the trial, Purtell denied that

5

he was then representing NFO in its civil litigation against RPC, a statement shown at the August 17 and 18, 2005 hearing to be false.

Grisel also contended that Green committed perjury at the trial by testifying that he advised NFO not to accept the $188,000 offered by RPC after the discounted sale of the cheese to a co-conspirator. Later, in the presentence report, Green is quoted as listing attorneys fees beginning on the same day the $188,000 check was tendered. The defendants claim that any alleged fraud was negated when the check was cashed.

In its order dated July 12, 2005, the district court found that the alleged perjured testimony was not material and did not establish a likelihood that, had truthful testimony been offered, the outcome would have been different. The court did note that Purtell's testimony "strongly suggests perjury." (Supp. JA 3888.) It concluded, however, that the only purpose of the testimony, sought during cross-examination by Grisel's counsel, was to show that NFO was trying to use the criminal proceeding to collect its debt, which the court held to be immaterial.

As to Green's alleged false testimony, the court found that, even if he had been aware of the $188,000 check and advised NFO to cash it, such facts would not have negated evidence establishing the defendants' scheme to defraud. Green's testimony, according to the district court, would merely establish that the defendants were successful in inducing NFO to give up its security interest based upon false pretenses.

### ii. Mikell's Motion.

In the same order denying the motion for a new trial based upon newly discovered evidence, the district court ordered an evidentiary hearing on Mikell's motion for reconsideration as to the issue of an alleged conflict of interest regarding his former counsel, Steven Harris. Mikell

6

contended that, because Harris was identified by the government during trial as an unindicted co-conspirator, an actual conflict of interest between Mikell and his counsel became apparent. Mikell also alleged that the government engaged in misconduct by deliberately painting Harris as a co-conspirator mid-way through the lengthy trial. Mikell alleged that the government's conduct, which resulted in Harris's withdrawal as counsel mid-trial, denied him his right to counsel of his choosing.

Grisel also claimed that, even though he and Mikell had separate counsel, Grisel was also prejudiced by the Harris withdrawal. Harris had represented Mikell and Grisel in prior civil proceedings. According to Grisel, Harris was providing guidance to his counsel regarding the law of secured transactions.

Four witnesses testified at the hearing conducted on August 17 and 18, 2005. The court described the testimony as duplicative of earlier testimony or otherwise of public record in the case. Harris stated that he and Harold Gurewitz represented Mikell. Harris also conceded that Gurewitz was the lead counsel. He further testified that his role in the trial would have benefitted both Grisel and Mikell.

The second witness was Craig Georgeff, an IRS criminal investigative agent. At trial, Georgeff had previously testified that he executed a search warrant at Grisel's home and office. During the execution of the warrant, Georgeff allowed Grisel to make a phone call. According to Georgeff's trial testimony before the jury, Grisel called Attorney Steven Harris. Georgeff also testified at trial that following the phone conversation, Mikell told him that he would not help in the location of records. During the hearing of August 2005, Georgeff also testified that, thirteen months before the trial, he had given to defendants' counsel a copy of his report, which included a description of the phone call to Harris. (Order May 16, 2006.)

7

The third witness was Daniel Opperman, the former attorney for Grisel and Mikell in a related civil lawsuit. Opperman testified that Harris was "calling the shots," but explained that he was referring to litigation strategy and not the operation of the business.

The last witness was Grisel, who testified that he had been relying on Harris's advice in the civil proceedings and that his lawyer looked to Harris for assistance as to the law of secured transactions. (Order May 16, 2006.) Mikell and Grisel contended that the government had unfairly introduced evidence suggesting that Harris was a co-conspirator, thereby requiring his disqualification.

Appellants sought to link the testimony given at the August 2005 hearing with other testimony adduced at trial. During the trial, the government also sought to introduce Exhibit 532, which was a letter dated June 4, 1996 from Harris to Mikell and Grisel. According to the government, the letter was evidence that Harris was acting as a co-conspirator with the defendants in order to delay and hinder creditors. (*Id.* at 2824–39.) The government asserted that, because the letter gave advice as to creating documents fraudulently defeating Mikell's personal guarantee of the debt owed to a Walter Hacker, the crime-fraud exception trumped the attorney-client privilege. (*Id.*) The defendants also had been charged and were on trial for defrauding Hacker; they were acquitted on all counts relating to Hacker. The district court ultimately found that the crime-fraud exception applied, regardless of whether the attorney was personally aware of the fraud. (*Id.* at 2826.)

At the time the letter was offered into evidence, the district court excused the jury and had extensive discussions with counsel. Significantly, the jury was never present when prosecutors described Harris as a co-conspirator. The prosecutor noted that, prior to trial, he had asked the court

8

to disqualify Harris.  Harris entered his appearance only one month before trial.  Prior to trial, the government advised the court that it intended to use Exhibit 532 and told the court of its concern that Harris could have a conflict.  The government contended that it should not be prohibited from introducing relevant evidence solely because Mikell's counsel was involved in a particular matter.

At this point in the trial, before a hearing was held on the issue of conflict of interest, Harris moved to withdraw as Mikell's counsel.  Mikell's lead counsel agreed and advised the court that Harris could not continue to represent Harris at trial.  After Mikell affirmatively approved, the court permitted Harris to withdraw.

During closing argument to the jury, the government referred to Harris as the defendant's "bulldog," in reference to his conduct in the civil proceedings.  (JA 3198–3203.)  Reference was made to Opperman's statement that "Harris was calling the shots."  (*Id.* at 3184.)  The prosecutor also contended that a counterclaim filed by Harris on behalf of the defendants was "just part of a delaying action."  (*Id.*)

Following the August 2005 hearing, the district court concluded in an order dated May 16, 2006 that its earlier decision denying Mikell's motion for a new trial was correct.  In the prior decision, the district found that, even if Harris operated under a conflict of interest, he had done so at the insistence of his client.  Further, Mikell had shown no prejudice which required a new trial.

This appeal followed.

## II.

The decision of the district court regarding claims of prosecutorial misconduct is reviewed *de novo* by this Court.  *United States v. Tarwater*, 308 F.3d 494, 510–11 (6th Cir. 2002) (citing *United States v. Emuegbunam*, 268 F.3d 377, 394 (6th Cir. 2001); *United States v. Clark*, 982 F.2d

9

965, 968 (6th Cir. 1993)).  In *Darden v. Wainwright*, the Supreme Court held that "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a violation of due process.'"  477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974)).

Claims of prosecutorial misconduct are reviewed under a two-step process.  *United States v. Carroll*, 26 F.3d 1380, 1383–87 (6th Cir. 1994) (citing *United States v. Bess*, 593 F.2d 749, 753–57 (6th Cir. 1979) and *United States v. Leon*, 534 F.2d 667, 678–83 (6th Cir. 1976)).  The first issue is whether the remarks or conduct were improper; the second is whether the remarks or conduct were flagrant.  *Id.,* 26 F.3d at 1387.  "The remarks or comments of the prosecutor must be placed within the context of the trial to determine whether such comments amounted to prejudicial error."  *United States v. Young,* 470 U.S. 1, 11–12 (1985).

Mikell contends that the prosecutor deliberately and improperly presented otherwise inadmissible evidence to force Harris to withdraw as counsel mid-trial.  (Mikell Br. 51–52).  The district court rejected this contention, first emphasizing that the government's claim that Harris was a co-conspirator was never made in the jury's presence.  (JX 3839, Order Nov. 11, 2004.)

Mikell points to the following as evidence of prosecutorial misconduct regarding Harris:

(1)     Georgeff Testimony.  Special Agent Georgeff testified that when Grisel's house was searched, Grisel called Harris and then did not assist Georgeff in finding certain documents.  The district court emphasized the fact that the government had produced Georgeff's report to the defendants in discovery, including a description of the phone call between Mikell and Harris.  The prosecutor stated that the testimony was offered to show that the IRS had not acted unreasonably in searching Mikel's home and had permitted him to call an attorney.  The district

court concluded that prior to trial Mikell knew of Harris's involvement and that the government could not have intended to use the letter at trial to disqualify Harris. Moreover, the government did not argue to the jury that Mikel's conduct, following his conversation with Harris, was evidence of guilt.[2]

(2)    Green and Purtell Testimony. Purtell and Green testified that Opperman, a local attorney representing the defendants in a related civil matter, was surprised when he learned that co-conspirator Hines had resold the cheese to Grisel. Purtell further testified that Opperman apologized to Purcell at a deposition in the same case and told him that Harris "called the shots" (JA 2289, 2410–14). This testimony was presented to support the government's claim that the defendants delayed notifying NFO as to the terms of the sale of the cheese in order to complete the fraud. The fact that Harris too was either in the dark or was concealing the details did not serve to render the testimony regarding Opperman's statement inadmissible as to Mikell or Grisel.

(3)    Receipt of payment. The government presented testimony that Harris received a payment of $35,000 from the proceeds made from the sale of cheese to Hines. The government used this testimony to establish that all of the proceeds received from the below-market sale of cheese under the NFO lien did not go to NFO as the secured creditor. This testimony was at least relevant, if not necessary, to the government's proof.

(4)    Letter concerning Hacker debt. The last item of evidence claimed to demonstrate the prosecutor's motive in disqualifying Harris is a letter from Harris to the defendants concerning the Hacker debt, in which Harris advised the defendants to "create exhibits to some new

_____

[2]Section V addresses Grisel's claim that Georgeff's testimony violated his Fifth Amendment rights.

11

transaction that will hopefully make Hacker happy" and to "provide added assurance that Alan's [Mikell] guarantee is dead" (JA 2826–39). Because the jury acquitted the defendants on all charges relating to an alleged fraud upon Hacker, the introduction of this evidence could not have prejudiced the defendants.

The more troublesome matter is that, at the time the document was offered, the prosecutor only then contended that Harris was a co-conspirator. Based upon the government's claim, the district found that the crime-fraud exception to the attorney-client privilege therefore applied. Even though the government's claim that Harris was a co-conspirator was never presented to the jury, the defendants contend that, at this juncture in the trial, the government deliberately set out to disqualify Harris from continued representation of Mikell.

This claim is not supported by the record. As soon as Harris entered his appearance as counsel for Mikell one month before trial, the prosecutor raised concerns that Harris should be disqualified. The government described Harris's representation of both defendants in related civil cases. The prosecutor also described the same letter Harris sent to the defendants regarding the Hacker matter in the pre-trial hearing . Further, prior to the jury's empanelment, both defendants stated in open court that they waived any potential conflict based upon Harris's prior representation of both of them.[3]

The district court concluded that the government learned the full extent of Harris's potential conflict only as the evidence developed at trial. The court also noted that, while the government had earlier raised questions about Harris's representation, it had not alleged that he had an actual conflict

---

[3]Later, during trial, Harris disclosed that he had also represented three of the government's witnesses, all of whom had been disclosed before the pre-trial conference. The district court admonished Harris, but did not grant the government's request that he be disqualified.

of interest.  Nonetheless, the court concluded that Mikell and Grisel had full knowledge of Harris's prior involvement and, like Harris, did not disclose such information or lodge any objection.[4]

The record does not disclose prosecutorial misconduct.  From the outset, the government opposed Harris's representation of Mikell and voiced concerns about conflicts of interest.  The full scope of the conflict developed only during the course of the trial.  Further, all of the accusations made by the government as to Harris's role as a co-conspirator were made outside the presence of the jury.

As we have held, "[i]n examining prosecutorial misconduct, it is necessary to view the conduct at issue within the context of the trial as a whole." *United States v. Beverly,* 369 F.3d 516, 543 (6th Cir. 2004) (citing *Young*, 470 U.S. at 12; *United States v. Francis*, 170 F.3d 546, 552 (6th Cir. 1999)).  Moreover, evidence admissible for one purpose may become a basis for prosecutorial misconduct, if improperly used in argument.  In *United States v. Carson*, the prosecutor referred in closing argument to the fact that a co-conspirator had pleaded guilty to the same felonies for which the defendant was on trial.  560 F.3d 566, 573–74 (6th Cir. 2009).  The prosecutor argued, "If [the felonies] didn't happen, what kind of deal is that? . . .  If the felonies didn't happen, why would he take that medicine?" *Id.,* 560 F.3d at 574.

This Court observed that a "guilty plea of a co-defendant or co-conspirator is never admissible as substantive evidence of a defendant's guilt." *Carson,* 560 F.3d at 574.  Evidence of a guilty plea may be used in evaluating the credibility of the co-defendant or co-conspirator. *Id*., 560 F.3d at 575.  In *Carson*, this Court noted that the defense repeatedly emphasized the fact that

---

[4]The government notes that Harris himself asked the court for permission to withdraw, which was granted.  As discussed below*,* the trial court correctly noted that Harris's withdrawal did not, by itself, speak to whether the earlier representation was conducted while Harris was conflicted.

the co-conspirator had pleaded guilty in exchange for a reduced sentence. The defense contended that such testimony could not be believed. The prosecutor's comments were made to bolster the co-conspirator's credibility.

In *Carson*, this Court concluded that the prosecutor's remarks were improper but did not mislead the jury. *Carson*, 560 F.3d at 576. The co-defendant's guilty plea was mentioned throughout the trial by both the defense and prosecution. *Id.*, 560 F.3d at 477. Moreover, the trial court instructed the jury that the co-conspirator's guilty plea could not be considered against the defendants. *Id.*, 560 F.3d at 576.

In the case at bar, the evidence offered by the government which tended to implicate Harris as a co-conspirator had a probative value and legitimate basis, wholly independent of Harris's role as trial counsel. As noted in *Carson*, both the context and the purpose of the tendered evidence are critical factors. The government was not limited in presenting its case simply because Harris was potentially implicated in some of the conduct. There is no showing that such evidence was offered as a ploy to disqualify Harris. Consequently, there has been no showing that the government engaged in prosecutorial misconduct.

Even if this Court were to conclude that prosecutorial misconduct occurred, the conduct was not flagrant and did not "make the resulting conviction a violation of due process." *Darden*, 477 U.S. at 181. Assuming that prosecutorial misconduct has been established, only flagrant conduct warrants a mistrial. As explained in *United States v. Galloway*, four factors determine whether the conduct was flagrant: "(1) whether the statements tended to mislead the jury and prejudice the defendant; (2) whether the statements were isolated or pervasive; (3) whether the statements were deliberately placed before the jury; and (4) whether the evidence against the accused is otherwise

14

strong." 316 F.3d 624, 633 (6th Cir. 2003) (citing *Francis*, 170 F.3d at 549–50; *Carroll*, 26 F.3d at 1385).

Mikell contends that the prosecutor's conduct in this case was more egregious than that described in *United States v. Carter,* 236 F.3d 777, 782 (6th Cir. 2001). In that case, the prosecutor told the jury in the rebuttal portion of the closing argument that what the defense attorney had said was "one tremendous colossal lie," "a lie, a bold fabrication." *Id.*, 236 F.3d at 785. The statement referred to defense counsel's contention that a bank teller had initially identified another person as the bank robber. Carter's counsel had correctly represented that she had changed her identification. Thus, the prosecutor's statement that the defense counsel's statement was a lie was incorrect. *Id.*, 236 F.3d at 784.

In *Carter*, we held that "this Court, along with the Supreme Court, has repeatedly noted that it is improper for counsel to make personal attacks on an opposing advocate." *Carter,* 236 F.3d at 785 (citing *Young*, 470 U.S. at 9 and *United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir. 1996)). In *Carter*, the prosecutor called the defense counsel a liar four times in closing argument. The claims were a personal attack on Carter's attorney and were inaccurate and misleading to the jury. *Id.*, 236 F.3d at 785–86.

*Carter* is inapposite to this case. The jury heard testimony as to Harris's actual involvement in the underlying facts of this case. Before the jury, the prosecutor did not impugn Harris's integrity or offer argument that was untrue or misleading.

In the course of the three-month trial, the government made several references to its claim that Harris was a co-conspirator. Significantly, no such claim was ever made in the presence of the jury. The references could not have misled the jury or prejudiced the defendants. The other

15

evidence presented by the government was strong. All of these considerations weigh in favor of the conclusion that any prosecutorial misconduct was not flagrant.

## III.

The decision of the district court in determining whether defense counsel operated under a conflict of interest, thereby violating the defendant's Sixth Amendment right to counsel, is reviewed de novo as a mixed question of law and fact. *United States v. Walker*, 160 F.3d 1078 (citing *United States v. Hopkins*, 43 F.3d 1116, 1119 (6th Cir. 1995)).

As the district court noted, Mikell presented two apparently conflicting positions regarding Harris. (Order May 16, 2006.) First, he contended that the government improperly introduced evidence tending to establish Harris as a co-conspirator. Second, Mikell asserted that Harris operated under a conflict of interest and his interests must have diverged from those of Mikell. (*Id*.) The same contradiction has been raised in this assignment of error.

The prosecutor anticipated the evidence discussed above regarding Harris's role at the time Harris entered his appearance. The government raised the issue of his conflict of interest at the pre-trial conference. While the extent of Harris's role became more obvious during trial, before trial, the prosecutor described Harris's role in pending civil litigation, in joint representation of Mikell and Grissel, and his letter regarding Hacker.

Mikell acknowledged and waived any conflict of interest regarding Harris. Simply because Harris represented Mikell did not prevent the government from offering otherwise admissible evidence of an unlawful conspiracy, even if such evidence implicated or involved Harris. The question is whether such evidence created a conflict of interest that prejudiced Mikell.

By the time the government explicitly described Harris as an unindicted co-conspirator, a conflict of interest was apparent. While Mikell had earlier waived any conflict regarding Harris's dual representation in a parallel civil proceeding, no such waiver occurred as to the government's claim that Harris was himself involved in a scheme to defraud.

The district court addressed the conflict issue on April 14, 1999, in a trial which began on February 22, 1999. At that point in the trial, the prosecutor had sought a ruling on the admissibility of the letter from Harris to the defendants regarding the Hacker debt. The prosecutor claimed that because Harris was a co-conspirator, the crime fraud exception applied to the attorney-client privilege.

The court excused the jury for the day and told counsel that a hearing could be needed to resolve any question of conflict. The court recognized that the potential conflict was separate and apart from the issues raised before trial.

At this juncture, Harris made a motion to withdraw as counsel for Mikell. The court asked Mikell if he objected, which he did not. Consequently, no hearing was held regarding a conflict of interest, and Harris was permitted to withdraw.

The question of whether the trial court erred in failing to inquire as to a conflict is made more difficult by the fact that some of the evidence described above had been adduced by the prosecutor prior to April 14, 1999, which arguably implicated Harris as a co-conspirator and which could have triggered the need for a hearing. As the district court itself observed, the conflict was "not avoided simply because it was revealed and the attorney withdrew."

The district court instead determined that Mikell had failed to establish any prejudice resulting from Harris's conflict of interest. According to the district court, Mikell offered no

17

evidence of specific instances indicating that Harris made decisions or omissions based upon his competing interests with his client. For the reasons that follow, the district court was correct in finding no prejudice to Mikell.

Under the Sixth Amendment, a defendant is entitled to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 685 (1984). When an attorney is actively representing conflicting interests, a defendant is deprived of effective assistance of counsel. In *Holloway v. Arkansas*, the Supreme Court held that there is inherent prejudice when one attorney is compelled to represent three co-defendants. 435 U.S. 475, 488–89 (1978). A defendant has the constitutional right to "an attorney devoted solely to his interests." *Mickens v. Taylor*, 535 U.S. 162, 185 (2002).

Under the traditional *Strickland* analysis, a criminal defendant typically must show (1) his attorney's performance was so deficient that counsel was not functioning as counsel guaranteed by the Sixth Amendment, and (2) counsel's performance prejudiced the defendant, requiring a showing that the attorney's errors were so serious as to prevent a fair trial. *Strickland,* 466 U.S. at 687.

In *Mickens*, the defendant's attorney had represented the murder victim, a juvenile, in an unrelated criminal case. At the time of the murder, the charges pending against the victim and his representation by Mickens' attorney were under seal. The same judge who appointed the attorney to represent Mickens had also appointed him earlier to represent the victim. *Mickens*, 535 U.S. at 164–65.

Mickens' counsel later testified regarding his belief that he no longer had any obligation to his deceased client. *Mickens*, 535 U.S. at 177. While such belief may have been mistaken, the district court found that the attorney's representation of Mickens was not influenced by his prior representation of the victim. The victim was stabbed and beaten before he was sexually assaulted

18

and murdered. A competent defense attorney would have avoided attacking the character of a 17-year-old victim who was raped and brutally murdered. As noted by Justice Kennedy in his concurring opinion, "Saunders' failure to attack the character of the 17-year-old victim and his mother had nothing to do with the putative conflict of interest." *Id.*, 535 U.S. at 178. Justice Kennedy observed that "a theoretical conflict does not establish a constitutional violation, even when . . . the trial judge should have known." *Id.*, 535 U.S. at 178–79.

The Supreme Court concluded in *Mickens* that the trial court, having knowledge of defense counsel's prior representation of the victim, should have conducted an inquiry, which is required when "the trial court knows or reasonably should know that a particular conflict exists." *Mickens*, 535 U.S. at 184 (citing *Cuyler v. Sullivan*, 446 U.S. 335, 346 (1980)). In *Mickens*, however, the Supreme Court rejected a "rule of automatic reversal when there existed a conflict that did not affect counsel's performance, but the trial judge failed to make the *Sullivan*-mandated inquiry." *Id.*, 535 U.S. at 172. Instead, to warrant a reversal, a defendant must establish that "the conflict of interest adversely affected his counsel's performance." *Id.*, 535 U.S. at 174.

Applying *Cuyler* and *Mickens*, it is clear that Mikell has not established that Harris's conflict of interest affected his performance. Mikell has not identified any specific instance before or during the trial in which Harris was compromised to Mikell's detriment. Additionally, the following circumstances further establish that Mikell was not adversely affected by the conflict of interest:

> (1) It is undisputed that Mikell's lead counsel through-out the trial was Harold Gurewitz, not Harris, and Gurewitz continued to represent Mikell after Harris withdrew;
>
> (2) Although not dispositive, Harris withdrew and Mikell consented to his withdrawal; and

19

(3)     The government sought to disqualify Harris before
        the trial began.

## IV.

In addition, Mikell contends that the government deprived him of his right to counsel of his own selection. There is no question that under the Sixth Amendment a defendant has the right to counsel of his or her selection. *Wheat v. United States*, 486 U.S. 153, 159 (1988). Moreover, if a defendant is deprived of such right, "it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation." *United States v. Gonzalez-Lopez,* 548 U.S. 140, 147–48 (2006). The right to counsel "is circumscribed in several important respects," however, and does not extend to an attorney laboring under an actual conflict of interest. *Wheat*, 486 U.S. at 159, 162. The district court "must recognize a presumption in favor of petitioner's counsel of choice"; however, "that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict. The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court." *Id.*, 486 U.S. at 164.

Immediately following Harris's withdrawal, the district court noted that it would have found a conflict of interest. The record discloses that Harris (1) had previously represented both defendants in a parallel civil proceeding; (2) had previously represented a number of witnesses who testified at trial and did not inform the court before trial; (3) wrote a letter to both defendants that was found by the district court not to be privileged, given the crime-fraud exception; and (4) was identified by the government as an unindicted co-conspirator.

From this, it is apparent that Harris's conduct prevented him from proceeding as Mikell's counsel. Even if this Court were to look past Harris's withdrawal as counsel and Mikell's consent, the record amply demonstrates that Harris was operating under an actual conflict of interest. Under such circumstances, Mikell was not deprived of his right to counsel of his selection.[5]

Finally, Grisel contends that he too was denied a fair trial by the prosecutor's deliberate attack on Harris, causing him to withdraw. Grisel claims that his lawyer was relying upon Harris, who was "the driving force of the defense team." (Grisel's Br. 47.)

Harris's own testimony on the record makes it clear, however, that (a) Harris never represented Grisel in this criminal case, and (b) Harris was not even the lead counsel for Mikell. Because of these circumstances, Grisel has no standing to contest Harris's conflict of interest. *United States v. Sims*, 845 F.2d 1564, 1568 (11th Cir. 1988). Even if Grisel had standing, his claims would fail for the same reasons as Mikell's.

**V.**

In connection with his claim that Harris was improperly disqualified, Grisel also contends that Special Agent Georgeff improperly testified that he let Grisel call Harris before the IRS searched his house. Georgeff testified that, after Grisel spoke to Harris, Grisel "said he was not going to cooperate." (JA 2743–45.) Grisel contends that this testimony was tantamount to a violation of his Fifth Amendment privilege against self-incrimination. This issue was never directly presented to the district court. Rather, Grisel presented Georgeff's testimony during the August 2005 hearing to support Grisel's claim that the prosecutor acted improperly in seeking to disqualify

---

[5]As discussed above, the Court has concluded that the prosecution did not improperly target Harris to force his withdrawal. This conclusion forecloses Mikell's claim that the prosecutor acted to deny him of his right to counsel of his choosing.

21

Harris. Because the Fifth Amendment violation was not asserted below, the claim of error is reviewable now only for plain error. *United States v. Castano*, 543 F.3d 826, 833 (6th Cir. 2008).

A jury may not consider a defendant's pre-arrest silence as substantive evidence of guilt. *Combs v. Coyle*, 205 F.3d 269, 283 (6th Cir. 2000). In *Combs,* this Court noted that, "[i]n a prearrest setting as well as in a post-arrest setting, it is clear that a potential defendant's comments could provide damaging evidence that might be used in a criminal prosecution; the privilege should thus apply." *Id.,* 205 F.3d at 283. The Fifth Amendment was violated to the extent Georgeff's testimony implied that Grisel's silence, as advised by Harris, was evidence of guilt.

The prosecution contended that the testimony was offered to demonstrate that the IRS did not prevent Grisel from calling an attorney. Importantly, after Georgeff's single reference to Grisel refusing to cooperate in the search, no further mention was made to the testimony. The single reference to Grisel calling Harris, and then subsequently refusing to cooperate, does not constitute an improper method of commenting on Grisel's silence. Even assuming that it did, the defendant must also establish under *Galloway*, 316 F.3d at 633, that the use of the statement was both flagrant and prejudicial. Applying *Carroll*'s four-part analysis, it is clear that the brief testimony did not tend to mislead the jury. Further, the testimony was isolated. The statement was not a deliberate attempt to comment on Grisel's silence. Finally, the other testimony presented in the three-month trial was strong. Admission of Georgeff's testimony was not therefore plain error. Grisel has not established that he was deprived of a fair trial based upon the withdrawal of Harris or the testimony of Georgeff.

**VI.**

22

Grisel asserts that the district court erred in denying his motion for a new trial based upon the failure of proof and perjured testimony. The decision of the district court denying Grisel's motion for a new trial based upon due process claims of perjured testimony, constructive amendment of the indictment and failure of proof is reviewed de novo. *See United States v. Allen*, 954 F.2d 1160, 1165 (6th Cir. 1992); *see also United States v. Wiegand*, No. 93-1735, 1994 U.S. App. Lexis 37209, *5 (6th Cir. Dec. 22, 1994) (citing *Allen*, 954 F.2d at 1165).

Grisel contends at great length that the government never established that RPC was in default, such as was required for NFO, as a secured creditor, to exercise its right to the cheese at the plant. (Grisel Br.17–35). Additionally, Grisel asserts that the government did not establish the market price of the cheese sold by RPC as a key part of the scheme to defraud. Consequently, Grisel argues no crime was committed. These arguments are without merit.

Being generous, these claims are based upon a misapprehension of the facts presented at trial. The government contended, and the jury found, that NFO was defrauded of the value of its security interest. According to the government's case, NFO had a first, secured position on cheese worth approximately $1 million. NFO obtained a restraining order, preventing RPC from moving the cheese from the plant. The defendants fraudulently induced NFO to agree that the cheese could be moved based upon the defendants' representation that it would be sold at the market price.

The government contended that Grisel and Mikell made a sham sale of the cheese to a co-conspirator at a price of less than 20% of its value. The government also offered proof that the co-conspirator then resold the same cheese to entities controlled by the defendants, which in turn sold the cheese for over $1 million. As a result, NFO received only $188,000 on collateral worth $1 million; entities controlled by Grisel and Mikell netted $700,000 on the same collateral, based upon

23

what the government claimed was a scheme to defraud. RPC paid NFO the $0.25 per pound it claimed was the "market price" for 770,000 pounds of cheese. Entities controlled by Grisel and Mikell bought the cheese for $0.30 per pound, giving a $0.05 skim to the co-conspirator. These same entities then sold the same cheese for an arms-length price of between $1.36 and $1.40 per pound.

Grisel claims that:

1. RPC was never in default;

2. The security interest of NFO was never extinguished;

3. The cheese was always subject to NFO's security interest; and

4. The market value of the cheese was never established.

The truth or falsity of the first three claims is irrelevant. The value of NFO's collateral was reduced by $700,000 as a result of the scheme to defraud. Grisel confuses the government's case with that of a private, secured creditor.

As to the fourth claim, it is significant that the actions of the defendants and the co-conspirator alone provide abundant evidence that the value of the cheese was between $1.36 and $1.40 per pound, since arms-length sales were made at these prices shortly after the sham sale for a price of $0.25 per pound. Moreover, the government presented other testimony regarding prices recorded by the Green Bay Exchange, a market-place for cheese, together with that of others in the market, all establishing that $0.25 per pound was a "joke."

Grisel also contends that a new trial is warranted, given the allegedly perjured testimony of Green and Purtell, both attorneys at one time for NFO who both testified at trial. The trial court found that both Green and Purtell gave testimony later found to be false.

During the trial, Green testified that he never recommended that NFO accept $188,000, representing $0.25 per pound of cheese. After trial, Green gave a statement on behalf of NFO that was incorporated into the presentence report. In the post-trial statement, Green said that NFO was actually paid the amount of $188,000. Grisel contends that the jury should have heard testimony that the check was cashed, as evidence that acceptance of the monies represented settlement and extinguished NFO's security interest.

The district court correctly held that such evidence was immaterial to the case. Even if NFO lost its security interest by negotiating the check, it does not follow that there was no scheme to defraud. The sham sale and deliberate concealment are the basis of the government's case, not the purported extinguishment of the security interest.

Purtell testified at trial that he was at one time involved in the civil litigation brought against RPC. He also testified on March 8, 1999 that, "I'm not involved in that case anymore." (JA 3877.) On remand, the Defendants demonstrated that on January 13, 1999, Purtell had actually filed a lawsuit against RPC on behalf of NFO. The district court described the trial testimony as "more strongly suggest[ing] perjury (or incorrect testimony at a minimum)." (JA 3888.)

Nonetheless, the district court correctly noted that the false testimony was not material to any triable issue. Had the jury known of the correct information regarding Purtell's representation, at best, it would have had additional information that NFO was pursuing its economic interests and sought assistance from the government in pursuing criminal charges. As the district court correctly

25

held, whether NFO or its counsel had such motivation was not probative evidence of whether a criminal fraud had been committed.

The district court correctly concluded that the claimed newly discovered evidence regarding the trial testimony of Green and Purtell would not have likely resulted in an acquittal.

Grisel contends that because "the proceeds of the liquidation sale were paid to RPC's creditors . . . there has been a constructive amendment to the nature of the charges in this case. As applied here, there can have been no crime." (Grisel Br. 34.) The issue was not presented to the district court and is not properly before this Court.

Moreover, the contention is without merit. Grisel contends that the proceeds received from the market-based price of $1.36 to $1.40 per pound of cheese, totaling over $1 million, were thereafter paid only to creditors of RPC. This argument overlooks the fact that NFO, which received only $188,000, had a first-position security interest in all the cheese. The other creditors paid from the proceeds included InnoQuest, an entity owned by Grisel. InnoQuest also distributed funds to Mikell and paid Harris $35,000 in attorneys fees. All of these facts are consistent with the indictment and the government's theory that Grisel and Mikell engaged in a scheme to defraud NFO of the value of its security interest.

Grisel's contentions do not establish that a constructive amendment to the indictment occurred. Instead, he essentially argues that, because the proceeds of the sale of the cheese went to creditors of RPC, no crime was committed, a contention which is false.

A constructive amendment occurs "when the terms of an indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an

26

offense other than the one charged in the indictment." *United States v. Smith*, 320 F.3d 647, 656 (6th Cir. 2003) (citing *Stirone v. United States*, 361 U.S. 212 (1960)).

The indictment clearly alleges the same scheme to defraud that the government pursued at trial. Grisel's only claim of variance concerns his incorrect contention that no crime was established. No constructive amendment occurred.

**VII.**

Grisel and Mikell contend that the district court erred in reinstating Count 52, which was a forfeiture count. Count 52 of the indictment sought forfeiture of specific assets owned by Grisel or Mikell, particularly their ownership interests in InnoQuest and other corporations that the government contended were used in the commission of money laundering and wire fraud.

The district court held that, because Count 1 alleged a conspiracy to defraud NFO and was reinstated on remand, the conviction on Count 52 must also be reinstated. Grisel contends that the government did not appeal Count 52 and that, as a result, the district court erred by reinstating it on remand. This assignment of error is without merit.

In the first appeal, the government filed a general notice of appeal as to each defendant, appealing generally "from the Judgment of Acquittal." (Notices of Appeal; JA 754, 755.) The government's original appellate brief noted that the scope of the government's appeal was limited to Counts 1–7, on which the defendants were acquitted based on insufficient evidence. (U.S. Br. 3, 28; JA 1518, 1543.) However, the government also noted in its brief that "[r]einstating count one will also entitle the government to pursue the forfeiture authorized by the jury's verdict on count 52." (U.S. Br. 45 n.20; JA 1560.) In its original opinion, this Court did not refer specifically to Count 52, but simply "reverse[d] the district court's judgment of acquittal on those counts

27

appealed." *Mikell*, 84 Fed. Appx. at 486. Considering the general nature of the government's notice of appeal, and considering that the government did not abandon Count 52 in its brief, we find that Count 52 was appealed, and the district court did not err by reinstating it.

## VIII.

For the reasons discussed above, the decisions of the district court are hereby affirmed.